UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PERRY L. ROSE, | 3:09-cv-00306 -ST |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| MISS PACIFIC, LLC, and PACIFIC FISHING LLC, | |
| Defendants. | |

STEWART, Magistrate Judge:

**<u>INTRODUCTION</u>**

Plaintiff, Perry L. Rose ("Rose"), a seaman, filed a complaint in the U.S. District Court,

Western District of Washington, against defendants Miss Pacific, LLC ("Miss Pacific"), Pacific

Fishing, LLC ("Pacific Fishing"), and *F/V Miss Pacific*, seeking damages under the Jones Act

and general maritime law for an injury to his left knee while working on the fishing vessel, the

*F/V Miss Pacific* (docket # 1). Defendants filed a motion to dismiss for lack of personal

jurisdiction, insufficient service, and lack of subject matter jurisdiction and for partial summary

1 – OPINION AND ORDER

judgment as to Pacific Fishing (docket # 9). The court granted that motion in part and, in lieu of dismissal, transferred the case to this court (docket # 39).

Rose filed an Amended Complaint on February 11, 2011, against only Miss Pacific and Pacific Fishing alleging injuries and damages due to negligence (Count I) and unseaworthiness (Count II) and seeking maintenance and cure (Count III) and unearned wages (Count IV) (docket # 90). Rose also seeks compensatory damages, punitive damages, attorney fees, prejudgment interest (except for the time period that the prosecution of this case was delayed by plaintiff's attorney), and costs and other disbursements.

Both defendants have filed a Motion for Partial Summary Judgment on the claims for maintenance and cure (Count III) and unearned wages (Count IV) and on all claims alleged against Pacific Fishing (docket # 94).

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

## FACTS

Rose worked as a manual laborer prior to his employment on the *F/V Miss Pacific* and over the years sustained some injuries which healed and never limited his ability to work. Rose 2009 Depo.,[1] pp. 85-86. Prior to the left knee injury at issue in this case, he had surgeries on both knees.

His right knee had arthroscopic surgery in 2002 to reconstruct his ACL and another surgery in 2008 to repair a tear in his meniscus. Oberg Decl., Ex. 1; Nonweiler Depo., pp. 30-31.

His left knee underwent arthroscopic surgery in 1994 to remove the prepatellar bursa and another arthroscopic surgery in December 2005 to correct an internal derangement. Oberg Decl., Exs. 3-5; McDonnell Depo., p. 58. At the December 2005 surgery on the left knee, Jessop McDonnell, M.D., noted significant crystalline deposits in the joint and removed portions of the meniscus. Oberg Decl., Ex. 5, p. 2. He diagnosed Grade II Chondrosis of the patellofemoral joint and the medial tibial plateau, gout/pseudo gout, and excessive lateral pressure. *Id*.

Rose also has suffered from gout since 1994 and experiences flare-ups approximately twice a year for which he takes Indomethacin. Rose 2009 Depo., pp. 43-47, 50. He keeps that medication proactively on hand. *Id*, p. 50.

---

[1] The parties have submitted documents with various attachments. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration or to the page(s) of the deposition transcript.

Rose has known Captain Mike Allen ("Allen") since the mid-1980s when he helped Allen get a job on a boat. Rose 2009 Depo., p. 43. In January 2008, Rose visited the emergency room after injuring his right knee from a fall while working as a log truck driver. *Id*, p. 42. At the hospital, Rose spoke with Allen's wife, a receptionist there, who told him about the potential deckhand position on the *F/V Miss Pacific*. *Id*. Rose then contacted Allen inquiring about the position and disclosed his recent right knee injury. *Id*, pp. 75-76. They discussed the fact that Rose's knee would be healed by the time the *F/V Miss Pacific* had completed its retrofitting. *Id*. Allen did not go through Rose's medical history with him. Allen Depo., p. 34.

Rose signed a Crewmember Agreement on June 6, 2008 ("June Agreement"), to perform shrimping work on the *F/V Miss Pacific*. Schwartz Decl., Ex. 4, p. 1. Paragraph 5 of that June Agreement is titled "Health of Crewmembers" and states as follows:

> Crewmember hereby certifies that he is in good health and has no physical disabilities which may affect his ability to perform his duties during the term of this agreement; has no allergies and is not receiving medical treatment for any condition except as follows:

*Id*.

At the end of that paragraph, Rose handwrote "allergic to penicillin" and on the back added: "On 3-26-08 had right knee surgery to remove floating cartilage [released] back to work on 5-26-08 with no restrictions." *Id*, p. 3. This statement is consistent with Dr. McDonnell's medical release dated May 20, 2008, which states: "Ok for work 5/26. No restrictions." *Id* , Ex. 6. He did not disclose his gout or left knee surgeries at that time.

Later Rose discussed his past left knee injuries with Allen while they were working together on the *F/V Miss Pacific* during the shrimping season in 2008. Rose 2009 Depo., pp. 77, 81-82. Allen also knew about Rose's gout because Rose had a flare-up in his toe during the shrimping season and needed to leave the boat to get his medicine. *Id*, p. 84.

On October 16, 2008, Rose signed another Crewmember Agreement for "dragging" ("October Agreement") which is identical to the June Agreement.  Schwartz Decl., Ex. 5. Although he disclosed at that time in writing that he had a penicillin allergy, he did not disclose his gout or any prior knee injuries and surgeries.  *Id.*  Nor did anyone specifically ask him about his medical condition.  Rose 2009 Depo., pp. 84-85.

On November 5, 2008, Rose slipped and injured his left knee on board the *F/V Miss Pacific* while the vessel was in port.  Amended Complaint, ¶ 6; Blye Decl., p. 22.  In the emergency room, Rose was given Indomethacin (his gout medication).  Oberg Decl., Ex. 13.  On November 10, 2008, David Maligro, PA-C, examined Rose and noted pain, swelling, stiffness, and blottable effusion with warmth.  *Id*, Ex. 1.  He also aspirated the knee and sent the aspirated fluid for analysis.  *Id.*  The fluid contained uric acid crystals which may indicate a gout attack. *Id*, Ex. 15; Nonweiler Depo., p. 26.  On November 13, 2008, David Black, M.D., reviewed Rose's MRI and recommended surgery of the left knee because of the torn menisci.  Black Depo., pp. 6-7.

Approximately two weeks after the incident, Rose's claim for maintenance and cure benefits was denied based on his failure to disclose his prior knee injuries and surgeries. Gremmert Depo., pp. 30, 40.  The decision was made by Pacific Fishing's in-house counsel, Craig Urness, without consulting medical professionals concerning the relationship of the injury to Rose's work.  *Id*, p. 40.  Rose did not return to work on the *F/V Miss Pacific* after his injury.

Blake Nonweiler, M.D., performed surgery on Rose's left knee in July 2009.  Nonweiler Depo., pp. 29-30.  He testified later that, given Rose's history, it was not unreasonable that Rose was treated prophylactically in the emergency room after his injury as if he had a gout attack.  *Id*, p. 5.  He also opined that his differential diagnosis would have been a gout attack.  *Id*, p. 50.

On July 16, 2009, based on a review of Rose's medical records at defendants' request, John F. Burns, M.D., opined that Rose's knee problems represented an aggravation of preexisting gout and degenerative arthritis in his left knee. Burns Decl., Ex. 1, pp. 2-3. He issued a supplemental report on July 31, 2009, noting that Rose should have reached maximum medical improvement within one month. *Id*, Ex. 2.

In September 2009, based on a review of Rose's medical records at the request of Rose's attorneys, David Waldram, M.D., stated that it was his "orthopedic opinion that clearly [Rose] had an acute injury. . . . Though Mr. Rose had preexisting gout, the gout in my opinion has no specific relationship to this acute meniscal tear." Schwartz Decl., Ex. 12, p. 4.

On the theory that Rose's injury was due to a gout attack and that he reached maximum medical improvement after 30 days, defendants paid his medical costs for the first 30 days and $600.00 in maintenance and cure[2] for that same time period, although Rose did not receive the latter payment until July 12, 2011. Loshbaugh Decl., Ex. C, p. 3; Oberg Decl., Ex. 16. Rose has unpaid medical bills of $2,835.72 from November 5, 2008, through February 19, 2009, for treatment of his left knee, and an unknown amount of unpaid medical bills for his July 2009 knee surgery. Rose Decl., Ex. A., ¶ 6. Rose also claims unearned wages in an unspecified amount for the balance of the fishing season for which he was employed on the *F/V Miss Pacific*.

///

///

///

---

[2] Maintenance and cure includes payment of unearned wages. "[I]n addition to wages, 'maintenance' includes food and lodging at the expense of the ship, and 'cure' refers to medical treatment." *Atlantic Sounding Co. v. Townsend*, 129 S Ct 2561, 2568 (2009). However, defendants' records of payments to Rose itemize them as medical, maintenance and cure, unearned wages, *etc*. According to those records, $600.00 was paid for maintenance and cure, but none for unearned wages. Loshbaugh Decl., Ex. C.

## DISCUSSION

### I. Fraudulent Concealment Defense

Defendants first seek summary judgment on the claims for maintenance and cure and unearned wages, arguing that, based on the undisputed facts, Rose fraudulently concealed his material preexisting medical history.

"Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." *Vaughan v. Atkinson*, 369 US 527, 531 (1962). Any ambiguities or doubts "are resolved in favor of the seaman." *Id* at 532. Unearned wages are part of the doctrine of "maintenance and cure." *Lipscomb v. Foss Maritime Co.*, 83 F3d 1106, 1109 (9th Cir 1996).

Even though a seaman has a pre-existing illness or injury, he may recover maintenance and cure if he has "a good faith belief that he is reasonably fit for duty" when he signs aboard. *Burkert v. Weyerhaeuser Steamship Co.*, 350 F2d 826, 829-830, n4 (9th Cir 1965). However, he is not entitled to maintenance and cure if he "is asked to disclose pertinent information during a prehiring medical examination or interview and intentionally conceals or misrepresents material facts." *Id* at 829 n4. As explained by the Fifth Circuit:

> Where the shipowner does not require a pre-employment medical examination or interview, the rule is that a seaman must disclose a past illness or injury only when in his own opinion the shipowner would consider it a matter of importance. . . . On the other hand, where the shipowner requires a seaman to submit to a pre-hiring medical examination or interview and the seaman intentionally misrepresents or conceals material medical facts, the disclosure of which is plainly desired, then he is not entitled to an award of maintenance and cure.

*McCorpen v. Central Gulf S.S. Corp.*, 396 F2d 547, 548-49 (5th Cir 1968), citing *Burkert* and other cases.

To prevail on a fraudulent concealment defense, an employer must show: "(1) that plaintiff intentionally misrepresented or concealed medical facts; (2) that the undisclosed facts were material to the employer's decision to hire the plaintiff; and (3) that a connection exists between the withheld information and the injury complained of in the instant suit." *Quiming v. Int'l Pac. Enter., Ltd.*, 773 F Supp 230, 236 (D Hi 1990) (construing *McCorpen*).

## A. __Intentional Concealment__

Intentional concealment, the first element of the fraudulent concealment defense, is satisfied by a "[f]ailure to disclose medical information in an interview or questionnaire that is obviously designed to elicit such information." *Brown v. Parker Drilling Offshore Corp.,* 410 F3d 166, 174-75 (5th Cir 2005). "The 'intentional concealment' element does not require a finding of subjective intent. Rather, it refers to the rule that a seaman may be denied maintenance and cure for failure to disclose a medical condition only if he has been asked to reveal it." *Vitcovich v. Ocean Rover*, 106 F3d 411 (9th Cir 1997) (unpublished), citing *Burkert*, 350 F2d at 829 n4.

Defendants argue that Rose intentionally concealed both his previous left knee surgeries and his gout. When Allen first hired Rose, he disclaims knowing about anything other than Rose's 2008 right knee surgery. According to Allen, "I think he should have told me about his other knee. And I also don't think he should have asked me for a job. I don't think he had any business being on the back deck of a drag boat." Allen Depo., p. 13. He believes that the questions he asked Rose about his medical condition during the hiring process made it clear that he wanted a complete medical history. *Id*, pp. 13-14.

Rose concedes that he did not talk with Allen at that time about his left knee surgeries, but argues that he was not required to do so because neither the June and October Agreements

nor Allen's pre-hiring interview sought to elicit this information. Both of the Agreements required him to certify that he was in good health and had "no physical disabilities which may affect his ability to perform his duties" and "is not receiving medical treatment for any condition." Rose argues that he had no current physical disability that might affect his ability to work on the boat, pointing to the fact that his doctor gave him a full medical clearance to return to work after his 2008 right knee surgery. It is industry practice to rely on a doctor's release. Hampel Depo., pp. 36-37. In addition, his knees did not limit his ability to do work at that time, and he was not receiving any medical treatment for his gout. Rose 2009 Depo., pp. 85-86.

The thoroughness of Rose's pre-hiring interview is disputed. Allen only asked Rose specifically about his right knee surgery, believing that Rose knew what is involved in working on a boat. Allen Depo., pp. 34-35. Defendants argue that Allen's questions should have put Rose on notice of his employer's interest in both knees. In support, they point to the findings of fraudulent concealment in two cases. However, both of those cases involve quite different job applications which specifically sought disclosure of past or present injuries.

In *Brown v. Parker Drilling Offshore Corp.*, 410 F3d 166 (5th Cir 2005), Brown injured his back in 1998. *Id* at 169. After recovering, he applied for a position with another employer and completed a questionnaire about his medical history, answering "No" to the question asking whether he had ever suffered from "Back Trouble." *Id.* Several months after being hired, he injured his back and was terminated for falsely reporting an on-the-job accident, filing a false accident claim, and failing to disclose his 1998 back injury. *Id.* Two months later in August 2000, Brown applied for a deckhand position with defendant. On the medical questionnaire, he answered "No" when asked whether he had "Past or Present Back and Neck Trouble" and was hired. *Id* at 170. After being hired, he reported a back injury in 2001 and sued for maintenance

and cure and other relief.  A jury returned a verdict in Brown's favor.  On appeal, the court held

that the jury committed clear error by finding that Brown had not knowingly concealed material

medical information.  *Id* at 174.  It explained that "Brown's understanding of his prior injury as

'trouble' . . . was necessarily established by the circumstances surrounding his termination from

[his previous employer]."  *Id* at 172.

In the other case cited by defendants, Quiming sustained a compression fracture in a

motor vehicle accident in 1978 prior to his employment with defendant.  *Quiming*, 773 F Supp at

233.  After a one-month hospitalization, he was released to light duty for 90 days and then

resumed his normal activities.  *Id.*  In November 1998, he applied for a job with defendant, was

interviewed twice and checked "No" on a job application which asked "Have you ever had or

have you now . . .  Back Trouble."  *Id.*  About a month later, he injured his back and then sued to

recover maintenance and cure.  Defendants filed a motion for summary judgment on the basis

that Quiming had intentionally failed to disclose his prior back injury.  Quiming argued that he

was not asked about any prior injuries during his job interviews and had a good faith belief that

his previous injury was not important.  The court concluded that his good faith belief was

irrelevant, stating:  "Even if the questionnaire did not constitute [a] medical examination or

interview, it should have been clear to Mr. Quiming that the questionnaire reflected [defendants']

interest in all of the areas mentioned in the questionnaire and was unquestionably a matter of

importance."  *Id* at 236.  Accordingly, the court granted summary judgment to defendants.

The circumstances here are different from either of those cases because the June and

October Agreements did not include any questions specifically designed to elicit information

from Rose about his prior knee injuries or surgeries.  Instead, they only asked about his general

health and present physical disabilities.

Nonetheless, defendants have submitted some evidence to support their contention that Rose knew about the importance of disclosing his prior left knee injuries. In particular, they point to his partial disclosure of his other medical history. He not only told Allen about his recent right knee surgery without being asked, but also disclosed his allergy to penicillin in both the June and October Agreements.

On the other hand, Rose has submitted evidence that Allen had some knowledge of Rose's left knee surgeries and gout. Rose testified that, based on their prior acquaintance, Allen had known about his injuries for "a long time" (Rose 2011 Depo., p. 31) and during the shrimping season, he talked with Allen on occasion about his knees and also had a gout flare-up for which he sought permission to leave the boat for medicine. Rose 2009 Depo., p.77. Allen disputes Rose's recollection as to the extent of his disclosure. Allen testified that he was surprised to learn of Rose's prior knee injuries and surgeries and declared that Rose had no business on a boat. Allen Depo., p. 13. But even if Rose is believed, defendants contend that his later disclosure is irrelevant since it occurred well after his initial hire in June 2008. But at this point, the court must view the facts in the light most favorable to Rose. From that viewpoint, Allen learned of Rose's prior left knee surgeries and gout after hiring him, but nonetheless did not fire him and instead hired him again in October 2008 for the "dragging" season. This leads to the reasonable inference that the pre-hiring interview and June Agreement did not ask Rose to disclose his prior left knee surgeries and gout.

On this record, a genuine issue of material fact exists as to whether Allen's pre-hire interview of Rose and/or the June and October Agreements were designed to elicit information that Rose intentionally chose not to disclose.

///

11 – OPINION AND ORDER

### B.  **Materiality**

To invoke the fraudulent concealment defense, defendants also must show that the undisclosed facts were material.  "The fact that an employer asks a specific medical question on an application, and that the inquiry is rationally related to the applicant's physical ability to perform his job duties, renders the information material for the purpose of this analysis."  *Brown*, 410 F3d at 175.  The issue of materiality relates to the hiring decision and not to whether the seaman could perform various physical tasks.  *Id.*

Defendants argue that Rose's history of past knee surgeries and gout were material because, if disclosed, they would not have hired Rose.  Allen Depo., p. 14.  As discussed above, Rose has submitted evidence that he disclosed this information to Allen before he was asked to sign the October Agreement.  If believed, this evidence leads to the reasonable inference that the nondisclosure of his past medical history in June could not have been material if he was again hired in October after his subsequent disclosure.  In addition, he was initially hired in June after he disclosed his recent right knee surgery, which leads to the reasonable inference that disclosure of his prior left knee surgeries also would not be considered material.

Based on the evidence submitted, a genuine issue of material fact exists as to what Rose disclosed to Allen and whether that disclosure was material.

### C.  **Causation**

The final element of the fraudulent disclosure defense is a connection between the nondisclosure and the injury.  "There is no requirement that a present injury be identical to a previous injury.  All that is required is a causal link between the pre-existing disability that was concealed and the disability incurred during the voyage."  *Brown*, 410 F3d at 178, citing *Quiming*, 773 F Supp at 236.  Moreover, the employer "need not prove that the prior injuries are

the sole causes of the [present injury].  It need only show a *causal relationship* between the prior injuries and the [present injury]."  *Id* at 176 (emphasis original).

Defendants point out that Rose injured the same knee in the same area as his past left knee injuries in 1994 and 2005.  Oberg Decl., Ex. 2, 4.  They also rely on the pre-existing gout in Rose's left knee.  The lab report after the injury on November 10, 2008, noted uric acid, a sign of gout, and Dr. McDonnell talked with Rose after his December 2005 left knee surgery about gout and the importance of controlling it.  *Id*, Ex. 7.  In addition, as opined by defendants' expert witness, Dr. Burns, "on a more likely than not basis, whatever episode did occur probably caused a flare-up of what was a gouty arthritis in his left knee.  This is of course verified by the fact that the patient presented with cloudy fluid in the knee which not only had an elevated white count but presented with gouty crystals."  Burns Decl., Ex. 1, p. 2.

However, Rose has submitted evidence to the contrary from two treating physicians and an expert witness.  Dr. Black, who treated Rose directly after the accident, testified that he would not conclude the symptoms were related to gout.  Black Depo., pp. 32-33.  Dr. Nonweiler, who performed the 2009 post-injury surgery, testified that the condition of gouty arthritis would not cause an acute meniscal tear.  Nonweiler Depo., pp. 29-30.  He also opined that though Rose was given gout medication at the time of the injury, it was simply prophylactic.  *Id*, p. 35.  Rose's expert witness, Dr. Waldram, opined that Rose "clearly . . . had an acute injury" that was unrelated to any pre-existing condition in his left knee.  Schwartz Decl., Ex. 12, p. 4.  Dr. Waldram also noted that Rose "has been treated for the gout and the gout itself is not related to the injury, nor was there any substantial aggravation of the gout by the injury described."  *Id.*

The differing expert opinions clearly create a fact issue concerning causation.  Thus, a genuine issue of material fact exists as to whether Rose's undisclosed prior injuries have any

causal connection to the injury at issue here.

### D.  Conclusion

Due to genuine issues of material fact exist as to all three elements, defendants are not entitled to summary judgment on the fraudulent concealment defense.

## II.  Punitive Damages

Defendants also seek summary judgment against Rose's claims for punitive damages. The seaman must be entitled to maintenance and cure before he can obtain an award of compensatory or punitive damages.  *Morales v. Garijak, Inc*., 829 F2d 1355, 1358 (5th Cir 1987), *abrogated on other grounds by Guevara v. Maritime Overseas Corp.,* 59 F3d 1496 (5th Cir 1996).  The Fifth Circuit has described the following "escalating scale" of recoverable damages when a shipowner denies maintenance and cure payments:

> [A] shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure.  If the shipowner has refused to pay without a reasonable defense, he becomes liable in addition for compensatory damages.  If the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for punitive damages and attorney's fees as well.

*Id*.

"[L]axness in investigating a claim that would have been found to be meritorious will subject a shipowner to liability for attorney's fees and punitive damages."  *Breese v. AWI, Inc.*, 823 F2d 100, 104 (5th Cir 1987), citing *Tullos v. Resource Drilling, Inc.*, 750 F2d 380, 388 (5th Cir 1985).  It is the medical, not the judicial, determination of permanency that terminates the right to maintenance and cure.  *Id* (citations and quotations omitted).  "This is a medical question, not a legal one; and therefore reliance on the advice of counsel, as opposed to the advice of a physician, is insufficient to constitute a reasonable investigation of a seaman's right

to maintenance and cure in the situation where counsel is not advised as to the seaman's medical condition." *Id* at 104-05.

Refusal to pay maintenance and cure cannot be willful and wanton if it is based on a reasonable defense such as the seaman's concealment of his medical condition. *Brown*, 410 F3d at 178 (finding clear error where jury could not rationally have determined the defendant was unreasonable in relying on its fraudulent concealment defense); *also see Glynn v. Roy Al Boat Mgmt. Corp.*, 57 F3d 1495, 1502, n11 (9th Cir 1995) ("[p]unitive damages are awardable, in some circumstances, to a seaman where payment for maintenance and cure is wrongfully denied") (citations omitted). Denial of maintenance and cure based on a colorable legal theory does not reflect a wanton and willful disregard of the seaman's rights. *Delaware River & Bay Auth. v. Kopacz*, 584 F3d 622, 635 (3rd Cir 2009); *Crow v. Cooper Marine & Timberlands Corp.*, 657 F Supp2d 1248, 1262 (SD Al 2009) (denying claim for attorney fees and punitive damages in light of colorable defense that seaman's right to maintenance and cure terminated upon re-employment in accustomed trade).

## A. Reasonableness of Fraudulent Concealment Defense (Count III)

To reasonably rely on a fraudulent concealment defense requires the employer to submit sufficient evidence that, if believed by the trier of fact, would sustain the defense at trial. Even if a fact is disputed, it is not unreasonable to rely it. However, the assertion of the defense must be reasonable in light of what the employer knew when first asserting the defense. *See Williams v. Wilmington Trust Co.*, 345 F3d 128, 132 (2nd Cir 2003). To consider the reasonableness of the defense at any later time, such as after experts are consulted in preparation for trial, would open the door for an employer to assert the fraudulent concealment defense in the hope that it would

15 – OPINION AND ORDER

later appear to be reasonable should the issue be investigated further.  This is contrary to the purpose of this defense.

As discussed above, defendants have submitted evidence, although disputed, that supports each of the three elements of the fraudulent concealment defense.  With respect to the third element of causation, a fact issue is created by the differing expert opinions.  However, those opinions were issued well after defendants made the initial decision to deny maintenance and cure benefits to Rose based on his alleged fraudulent concealment.  Since the availability of punitive damages rests on information known at the time the defense is first asserted, those expert opinions are irrelevant and cannot be considered.  Nonetheless, the record reveals that before invoking the fraudulent concealment defense, defendants had compiled Rose's medical records and learned of his undisclosed prior left knee injuries and surgeries, gout, and presence of uric acid in the knee joint at the time of the injury.  Gremmert Depo., pp. 19-20.  Thus, they did not act in bad faith, arbitrarily, callously, or unreasonably when they ceased to pay Rose maintenance and cure.  Because defendants reasonably asserted the fraudulent concealment defense, even if they ultimately fail to sustain that defense at trial, all other actions allegedly taken by them in bad faith are irrelevant.

Thus, defendants' motion for summary judgment is granted as to Rose's claims for punitive damages in Count III (maintenance and cure).  Moreover, based on the reasonable assertion of the fraudulent concealment defense, Rose also cannot recover compensatory damages or attorney fees on Count III.

### B.  Unearned Wages (Count IV)

Defendants also seek summary judgment against punitive damages alleged in Count IV for unearned wages.  If defendants paid Rose unearned wages as part of the maintenance and

cure benefits paid for the first 30 days after his injury, then they are not liable for punitive

damages when they ceased payment based on assertion of the fraudulent concealment defense.

However, it appears from the record that defendants did not pay Rose any unearned wages on the

theory that his employment ended by the time of his injury.  Loshbaugh Decl., Ex. C, p. 1.

Based on that assumption, defendants' motion against the punitive damages alleged in Count IV

hinges on how to calculate the period of Rose's employment.

"Unearned wages are only available for the 'period of employment.'"  *Day v. American*

*Seafoods Co., LLC*, 557 F3d 1056, 1058 (9th Cir 2009), citing *Berg v. Fourth Shipmor Assoc.*, 82

F3d 307, 309 (9th Cir 1996) (citations and quotations omitted).  According to both the June and

October Agreements, Rose's "term of service" was on a "voyage by voyage basis."  Schwartz

Decl., Exs. 4 & 5, p. 1, ¶ 1.  Defendants contend that Rose's employment ended with his last

voyage prior to his injury which occurred in port.  Rose disagrees, contending that his period of

employment extended to the end of the "dragging" season which he anticipated would run until

approximately April 2009.  Rose Decl., Ex. A, ¶ 17.

The *F/V Miss Pacific* generally made short trips of no more than six days, delivering

catch to Pacific Coast Seafood in Warrenton, Oregon.  *Id*, ¶ 26.  The ship and crew would return

to fishing the same day as the delivery, but sometimes would stay overnight due to late delivery

or bad weather.  *Id.*  When staying overnight on land, crewmembers were allowed to spend the

evening at their homes and commute to the vessel the next morning, on the condition that they

were on-call and available on short notice if needed.  *Id*, pp. 26-27.  When not at sea,

crewmembers performed some work on the boat while waiting for the weather to break.  Rose

2011 Depo., p. 21.  Tasks may include unloading, cleaning the hold, getting the deck ready,

making repairs, and getting ready to go out to sea. *Id*, pp. 21-22. Crewmembers were not paid based on time, but were paid based on their fishing shares. *Id*, p. 19.

After signing the June Agreement, Rose made many trips on the *F/V Miss Pacific* through September. Rose Decl., Ex. A, ¶ 3. After signing the October Agreement, he made approximately three more trips. *Id*, ¶ 18. On November 4, 2008, he stayed the night at his home and was available on call should he be needed. *Id, ¶ 3*. On November 5, 2008, he drove his son to school and then to Warrenton, Oregon, to work on the boat and, while working on board, injured his left knee. *Id*. Rose argues he is entitled to payment of unearned wages through the end of the "dragging" season because he suffered an acute injury requiring recovery which extended well beyond April 2009.

At issue here is not just the cause of Rose's injury, but also the terms of the June and October Agreements. Defendants argue that the language of the two agreements is unambiguous and that the phrase "voyage by voyage basis" means a single fishing trip. Thus, they disclaim any obligation to pay unearned wages after the end of the fishing trip immediately prior to Rose's injury.

In support, defendants cite *Day*, where the plaintiff sought to admit extrinsic evidence that the period of employment was longer than a single voyage as agreed in the employment contract. The written contract defined "trip" as "one fishing voyage, from the time the seaman reports to the vessel to the time the catch is unloaded." Based on that unambiguous language and an integration clause, the court held that the plaintiff could not overcome the parole evidence rule and rejected the extrinsic evidence. *Id,* 557 F3d at 1058.

*Day* is distinguishable from Rose's employment agreements. In *Day,* the employment agreement specifically defined "trip," unlike the June and October Agreements in this case which

do not define "voyage."  As Rose notes, if "voyage by voyage" means only one trip to sea, then during the season he would "have had a whole stack of these [agreements] from trip to trip," which he did not.  Rose 2011 Depo., p. 19.  Unlike "trip" in *Day*, the phrase "voyage by voyage" is ambiguous, allowing the court to turn to extrinsic evidence.

Extrinsic evidence includes the parties' intent.  Rose believed that his employment was seasonal:

> Defendants claim that [term of service paragraph] means I was only hired for one trip.  However, the "voyage by voyage" term . . . was never explained to me as limiting my crew service to one trip, and I understood I was hired through the end of dragging season under the 10/16/08 Crew Agreement, which would have lasted until April 2009.

Rose Decl., Ex. A, ¶ 17.

This interpretation is consistent with the conduct of the parties.  Between trips, the crew members cleaned and readied the boat for return to sea and, if they left the boat, they remained on-call.  *Id*, Ex. 1, ¶ 26.

When asked his understanding of the term "voyage," Rose admitted that the term was different from "season" and said that "it would be easier if it said from season to season, but a voyage would just mean a trip, I'm assuming."  Rose 2011 Depo., p. 20.  Defendants contend that this admission is consistent with their own interpretation.  However, given Rose's other testimony as to his understanding that he was hired through April 2009, at best this "admission" merely underscores the ambiguity of the language.

Thus, a genuine issue of fact exists as to whether defendants were obligated to pay Rose any unearned wages after his injury.  Accordingly, defendants are not entitled to summary judgment on punitive damages alleged in Count IV based on Rose's period of employment.[3]

## III.  Claims Against Pacific Fishing

Pacific Fishing seeks dismissal of all claims alleged against it on the basis that it is neither the shipowner nor the employer and, thus, is not a proper party.

A seaman may bring "actions against the ship owner for unseaworthiness and general negligence. The duty to provide a seaworthy ship extends not only to the owner's employees but to all 'who perform the ship's service . . . with his consent or by his arrangement.'"  *Mahramas v. American Export Isbrandtsen Lines*, 475 F2d 165, 169 (2nd Cir 1973), citing *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 95 (1946).   "The owner of the ship owes a duty of reasonable care 'to all who are on board for purposes not inimical to [the shipowner's] legitimate interests.'"  *Id*, citing *Kermarec v. Compagnie Generale Transatlantique*, 358 US 625, 632 (1959).  A plaintiff's unseaworthiness claim lies only against the vessel owner.  *Cerqueria v. Cerqueria*, 828 F2d 863, 865 (1st Cir 1987), citing *Stephenson v. Star-Kist Caribe*, 598 F2d 676, 679 (1st Cir 1979); *Baker v. Raymond Int'l*, 656 F2d 173, 181 (5th Cir 1981), *cert denied*, 456 US 983 (1982).

A seaman may also bring actions against his employer under general maritime law for maintenance and cure and under the Jones Act.  "An action for maintenance and cure can . . . be maintained only against the employer because the right arises out of and is implied in the contract of employment."  *Mahramas*, 475 F2d at 170, citing *Aguilar v. Standard Oil Co. of New Jersey*, 318 US 724, 730 (1943); *see also Cerqueria*, 828 F2d at 867, citing *Fink v. Shepard S.S.*

---

[3]  However, as discussed above, if defendants paid unearned wages as part of the maintenance and cure for the first 30 days after Rose's injury and then ceased payment based on his alleged fraudulent concealment, then Rose cannot recover any punitive damages on Count IV.

*Co.*, 337 US 810, 815 (1949) (the right to maintenance and cure is incident to the employer-employee relationship and stems from the contract of employment); *Cosmopolitan Shipping Co. v. McAllister*, 337 US 783, 787 n6, 791 (1949).  Under the Jones Act, "[a] seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer."  46 USC § 30104.  "The Jones Act applies only between employees and their employers."  *Mahramas*, 475 F2d at 170.

Both the June and October Agreements state that the parties to the contract are Miss Pacific as "the owner of the Vessel" and Rose as the "Crewmember."  Schwartz Decl., Ex. 4 & 5, p.1.  However, Rose argues that there is a genuine issue of fact whether Pacific Fishing is either the shipowner or the employer.

With respect to whether Pacific Fishing is the shipowner, no factual dispute exists.  Miss Pacific purchased the *F/V Miss Pacific* in December 2007 and is registered as its sole owner with the U.S. Coast Guard.  Loshbaugh Decl., ¶ 5.  Suppl. Oberg Decl., Ex. 1.  Rose points to several facts, such as Miss Pacific's limited assets and existing debt, which he contends blur the corporate lines between Miss Pacific and other entities owned or controlled by Pacific Fishing.  However, these facts are more relevant to imposing liability on Pacific Fishing based on a theory of piercing Miss Pacific's corporate veil.  That theory is not currently pled by Rose and may be better addressed if Rose obtains and is unable to collect a judgment against Miss Pacific.

With respect to whether Pacific Fishing is Rose's employer, a factual dispute does exist.  Pacific Fishing has submitted evidence from Miss Pacific's controller, Cynthia Loshbaugh, that it did not employ Rose.  Loshbaugh Decl., ¶¶ 1, 13.  Allen hired the crew, including Rose, and Miss Pacific paid their wages.  *Id*, ¶¶ 6, 9-10.  Miss Pacific also administered Rose's injury claim (through the adjuster) and made all payments relating to his maintenance and cure within its insurance deductible.  *Id*, ¶¶ 11-12.

21 – OPINION AND ORDER

However, Rose has submitted other evidence which casts doubt on Pacific Fishing's role. First, both the June and October Agreements are titled "Pacific Fishing LLC Crewmember Agreement." Pacific Fishing has provided no explanation as to why its name is on those agreements. Rose argues that this is sufficient evidence to reasonably infer that Pacific Fishing is his employer, citing *Creps v. Truco Marine, LLC*, No. C-11-01751-DMR, 2011 WL 5577083, at *3 (ND Cal Nov. 8, 2011), and *Bender Welding & Mach. Co., Inc. v. M/V Sovereign Opal*, 415 F Supp 772, 779 (SD Ala 1976).

However, *Creps* is easily distinguishable. Creps sued his employer Truco (formerly Patriot Holdings) for an injury on board a vessel during the course of his employment. Truco removed the case to federal court on the basis that Patriot Contract Services LLC ("PCS") was Creps' employer and moved for summary judgment on the basis that it was the wrong defendant, pointing to various employment forms which explicitly identified "Patriot Contract Services" or "PCS vessels," including a crew data form, employment-related credit report authorization form, drug alcohol certification and consent form, and medical disclosure information form. *Id.* However, other forms listed the employer vaguely as "Patriot," Creps received earning statements from American Shipment Management and checks from Patriot Group, and multiple affiliated companies had "Patriot" in their name. *Id.* The record also showed that PCS and Truco were intertwined. The court concluded that "[t]hese facts and ambiguities create enough doubt that [it] cannot definitively hold that there is no possibility that Truco employed" Creps. *Id.* Moreover, the court did not find that Truco was an employer – only that it did not sustain removal jurisdiction. In contrast here, the only forms at issue are the June and October Agreements.

*Bender Welding* also is easily distinguishable.  It involved several documents, including employment contracts, which indicated that two corporations were in fact one corporation, the named defendant.

Although these two cases support the conclusion that Pacific Fishing's name at the top of those agreements may be somewhat suggestive of an employment relationship, more evidence is required to create a genuine issue of material fact.

Second, Rose argues that Pacific Fishing is named as the insured "member" under an insurance policy that covers *F/V Miss Pacific*.  Schwartz Decl., Ex. 17, p. 2.  In addition, both Pacific Fishing and Miss Pacific are listed on the policy as assured.  Id, p. 3.  Whether an entity carries and pays for liability insurance is an indication that it is an employer.  *See Cape Shore Fish Co., Inc. v. United States*, 330 F2d 961, 969 (Ct Cl 1964).  However, it is not the only factor.

"The touchstone for determining the presence or absence of an employer-employee relationship is . . .  whether the person performing the services for another is subject to the other's control or right to control."  *Id* at 964.  "In determining a seaman's employer, a court must look to 'the plain and rational meaning of employment and employer, which means that the right to control is one of the most important factors to consider."  *Mahramas*, 475 F2d at 171, citing *Cosmopolitan Shipping Co.*, 337 US at 791.

With respect to the right to control, the undisputed facts reveal that the general manager of Pacific Fishing, Jerry F. Hampel, acquires the vessels, hires the skippers, and directs the vessels' operations, including the port of operation, and where to deliver the catch.  Hampel Depo., pp. 9-10, 16.  He manages a fleet of eight or nine vessels, including the *F/V Miss Pacific. Id* at 14-15.  All vessels in the fleet sell their catch to Pacific Seafood.  *Id* at 15-16.  Hampel hired Allen and then later fired him for not conforming with directions.  *Id* at 10-11, 20-21.  Although Loshbaugh is Miss

Pacific's controller, she also works for a number of related companies, is paid by Bandon Pacific, Inc., a fish processing plant, and works out of one office with a sign that says Pacific Seafood. Loshbaugh Depo., pp. 6-10, 35.  In addition, Pacific Fishing is the sole member of Miss Pacific.  *Id*, p. 10.  The record is silent as to other facts that would be helpful on this issue, such as who paid for the liability insurance, who received, calculated and distributed the proceeds from each catch, and who maintained the employment records.  Nonetheless, Hampel's control of Allen and the operations of the *F/V Miss* Pacific, combined with Pacific Fishing's name on the June and October Agreements and insurance policies and the close relationship between Pacific Fishing and Miss Pacific, is sufficient to create a fact issue as to whether Pacific Fishing has sufficient control over Rose to be considered his employer.

Pacific Fishing also argues that Rose can have only one employer; otherwise, he would obtain a double recovery from two different employers.  However, two or more employers may jointly employ someone and each be held individually responsible.  For example, an entity may be a joint employer under the FLSA, 29 USC § 203(d), based on four factors known as the "economic realities" test:  namely "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Bonnette v. Cal. Health & Welfare Agency*, 704 F2d 1465, 1470 (9th Cir 1983).

Thus, based on the current pleadings, Pacific Fishing is entitled to summary judgment as to all claims alleged against it as a shipowner, but is denied summary judgment as to all claims alleged against it as an employer.

///

///

///

24 – OPINION AND ORDER

## **<u>ORDER</u>**

Defendant's Motion for Partial Summary Judgment (docket # 94) is GRANTED as to compensatory damages, punitive damages and attorney fees in Count III (maintenance and cure), as to punitive damages in Count IV (unearned wages) and as to all claims alleged against Pacific Fishing as a shipowner, and is otherwise DENIED.

DATED this 10th day of January, 2012.

/s  Janice M. Stewart

_____
Janice M. Stewart
United States Magistrate Judge

25 – OPINION AND ORDER